**Thomas Francis MOROCH, Appellant,**

v.

**Christy Calvert COLLINS (Moroch), Appellee.**

No. 05–03–00492–CV.

Court of Appeals of Texas, Dallas.

Sept. 6, 2005.

Rehearing Overruled Nov. 3, 2005.

Anthony A. Petrocchi, Christopher M. Weil, Weil & Petrocchi, P.C., Dallas, for Appellant.

Paula J. Gaus, Irving, for Appellee.

Before Justices MOSELEY, BRIDGES, and LANG–MIERS.

## OPINION

Opinion by Justice MOSELEY.

Thomas Francis Moroch appeals from a final decree of divorce from Christy Calvert Collins (Moroch).[1] In seventeen issues, Thomas challenges: (1) the trial court's characterization of the parties' estates; (2) the economic contribution award and the division of property; (3) the child support award; and (4) the attorney's fee award. In an additional issue, he challenges the admission of evidence relevant to Christy's economic contribution claim. For the reasons below, we resolve Thomas's issues against him and affirm the final decree of divorce.

## FACTUAL AND PROCEDURAL BACKGROUND

Thomas and Christy married in 1976. They have two children, who were nineteen and sixteen years old when the divorce was granted. In 1979, Thomas and Christy purchased a house in Dallas referred to as the "DeLoache property." The deposit/earnest money paid on the contract for the DeLoache property was $10,000. The parties stipulated that the amount financed was $300,000, which was secured by a lien on the DeLoache property and satisfied in 1979. During the marriage the DeLoache property was renovated in two stages: the house was "gutted and rebuilt" between 1979 and 1986, and a garage was built between 1991 and 1992. The parties stipulated that the fair market value of the house for purposes of the divorce was $1,545,000.

In 1987, Thomas and Christy signed a postnuptial agreement partitioning their property. The only items designated as community property were the DeLoache property and the funds in "the household account."[2] All other property was partitioned as either Thomas's or Christy's separate property. Separate property included earnings and property acquired in the future and the income, property, or increases arising from the separate property of each. The postnuptial agreement also provided for certain waivers, releases, and liability limits on the separate property.

In her original petition for divorce, Christy raised issues regarding conservatorship, child support, reimbursement, and attorney's fees. In her first supplemental petition for divorce, Christy made a claim for economic contribution to her separate estate against the community estate. Specifically, Christy claimed that her separate property estate contributed approximately $2.1 million to the community estate, and she requested that, if that amount exceeded the equity in the DeLoache property, then the entire amount of the equity should be awarded to her. Thomas answered, but made no counterclaims. An attorney ad litem was appointed for the children. Temporary orders were entered on behalf of the children.

Trial was to the court. The final divorce decree:

- dissolved the marriage;

- provided for conservatorship of and access to the two minor children;

- provided that Christy would make a lump-sum child support payment of $76,500 [3] to Thomas;

---

1. The divorce decree ordered that Christy Calvert Collins Moroch's name be changed to Christy Calvert Collins.

2. "Household account" refers to the household account at Union Bank.

3. The divorce decree also states the amount as $76,000.

- incorporated the 1987 postnuptial agreement;
- granted Christy's claim for economic contribution in the amount of $1,559,043.45, and awarded her the DeLoache property in satisfaction of the claim;
- concluded that, after the award of the DeLoache property to Christy, pursuant to the parties' postnuptial agreement, there was no more community property to be awarded;
- granted Christy's request for attorney's fees and provided that the award was subject to a dollar-for-dollar credit against the lump-sum child support payment; and
- awarded separate property to the parties.

The trial court made findings of fact and conclusions of law, but refused Thomas's request for additional findings of fact and conclusions of law. The trial court denied Thomas's "motion for reconsideration, or to set aside final order, or for new trial" by written order. This appeal followed.

## DIVISION OF PROPERTY

In issues one through ten, Thomas challenges the award of the DeLoache property in satisfaction of Christy's claim for economic contribution. In issue sixteen, Thomas challenges the division of property; in issue seventeen, Thomas challenges the admission of certain evidence relating to the property division. To place our review of these issues in context, we recount the general principles governing the award of marital property in divorce cases, including the law relating to contribution from one estate to another.

### A. APPLICABLE LAW

■ A trial court is charged with dividing the community estate in a "just and right" manner, considering the rights of both parties. TEX. FAM.CODE ANN. § 7.001 (Vernon 1998); *LaFrensen v. La Frensen*, 106 S.W.3d 876, 878 (Tex.App.-Dallas 2003, no pet.). Whether the property is separate or community property is determined by the facts that, according to rules of law, give character to the property. *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex.App.-Fort Worth 2004, no pet.) (citing *Robles v. Robles*, 965 S.W.2d 605, 615 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (op. on reh'g)). Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Id.* (citing *Cockerham v. Cockerham*, 527 S.W.2d 162, 168 (Tex.1975)). When separate property has not been commingled or its identity as such can be traced, the statutory presumption is dispelled. *Welder v. Welder*, 794 S.W.2d 420, 425 (Tex. App.-Corpus Christi 1990, no writ) (citing *Estate of Hanau v. Hanau*, 730 S.W.2d 663, 667 (Tex.1987)). However, if the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community presumption prevails. *Boyd*, 131 S.W.3d at 612.

■ When tracing separate property, it is not enough to show that separate funds could have been the source of a subsequent deposit of funds. *Id.* (citing *Latham v. Allison*, 560 S.W.2d 481, 485 (Tex.Civ.App.-Fort Worth 1977, writ ref'd n.r.e.)). Moreover, as a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *Id.* (citing *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.-Houston [14th Dist.] 2003, pet. de-

nied) (op. on reh'g)); *Bahr v. Kohr*, 980 S.W.2d 723, 728 (Tex.App.-San Antonio 1998, no pet.); *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Any doubt as to the character of property should be resolved in favor of the community estate. *Boyd*, 131 S.W.3d at 612 (citing *Akin v. Akin*, 649 S.W.2d 700, 703 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.)).

"A marital estate that makes an economic contribution to property owned by another marital estate has a claim for economic contribution with respect to the benefitted estate." TEX. FAM.CODE ANN. § 3.403(a) (Vernon Supp.2004–05). A claim for economic contribution does not affect the inception of title under which the character of property is determined at the time the right to own or claim the property arises. *Id.* § 3.404(a) (Vernon Supp.2004–05). Instead, it creates a claim against the property of the benefitted estate by the contributing estate. *Id.* § 3.404(b) (Vernon Supp.2004–05). Here, the claim matures on dissolution of the marriage. *Id.*

As pertinent here, "economic contribution" is the dollar amount of: (1) the reduction of the principal amount of that part of a debt, including a home equity loan incurred during marriage, secured by a lien on property, and incurred for the acquisition of, or for capital improvements to, property; and (2) capital improvements to property other than by incurring debt. *Id.* § 3.402(a)(3)(A)-(C), (6) (Vernon Sup. 2004–05). Pursuant to the then-effective statute and as applicable here, the amount of an economic contribution claim is calculated by multiplying the equity in the benefitted property on the date of dissolution of the marriage by a fraction. The numerator of the fraction is the amount of economic contribution to the property by the contributing estate, while the fraction's de-nominator is the sum of three amounts: (i) the economic contribution to the property by the contributing estate; (ii) the equity in the property as of the date of the first economic contribution by the contributing estate; and (iii) the economic contribution to the property by the benefitted estate during the marriage. Act of May 22, 2001, 77th Leg., R.S., ch. 838, § 2, sec. 3.403(b), 2001 Tex. Gen. Laws 1679, 1681, *amended by* Act of May 28, 2003, 78th Leg., R.S., ch. 230, § 1, 2003 Tex. Gen. Laws 1056, 1057 (current version at TEX. FAM.CODE ANN. § 3.403(b), (b–1) (Vernon Supp.2004–05)). Here, the amount of a claim may not exceed the equity in the property on the date of dissolution of the marriage. TEX. FAM. CODE ANN. § 3.403(d).

Property possessed by either spouse during or on the dissolution of marriage is presumed to be community property. TEX. FAM.CODE ANN. § 3.003(a) (Vernon 1998). Thus, a spouse making a claim for economic contribution on behalf of his or her separate estate must prove by clear and convincing evidence that the funds expended to reduce the community debt were separate funds. *Id.* § 3.003(b). The statutory presumption that property possessed by either spouse upon dissolution of the marriage is community is a rebuttable presumption and is overcome by evidence that a specified item of property is the separate property of one spouse or the other. *Jackson v. Jackson*, 524 S.W.2d 308, 311 (Tex.Civ.App.-Austin 1975, no writ). Because the presumption is rebuttable, the general rule is that, to discharge the burden imposed by the statute, a spouse must trace and clearly identify property claimed as separate property. *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex.1973). The burden of tracing is a difficult, but not impossible, burden to sustain. *Boyd*, 131 S.W.3d at 612 (citing *Latham*, 560 S.W.2d at 484). Tracing in-

volves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Id.* (citing *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex.App.-Austin 2002, pet. denied)).

In a decree of divorce, the court shall determine the rights of both spouses in a claim for economic contribution as provided by Family Code Chapter 3, Subchapter E, in a manner that the court considers just and right, having due regard for the rights of each party and any children of the marriage. TEX. FAM.CODE ANN. § 7.007(a) (Vernon Supp.2004–05). The court shall further order that a claim for an economic contribution by one separate marital estate of a spouse to the community marital estate of the spouses be awarded to the owner of the contributing separate marital estate. *Id.* § 7.007(a)(2).

## B. STANDARD OF REVIEW

We review a trial court's division of property under an abuse of discretion standard. *LaFrensen*, 106 S.W.3d at 878. A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Id.*

A trial court's findings are reviewable for legal and factual sufficiency of the evidence supporting them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). However, in family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standard of review; as a result, legal and factual insufficiency are not independent grounds of reversible error, but instead constitute factors relevant to our assessment of whether the trial court abused its discretion. *Boyd*, 131 S.W.3d at 611; *see*

*Beaumont Bank N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991). Accordingly, to determine whether the trial court abused its discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Boyd*, 131 S.W.3d at 611; *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex.App.-El Paso 1998, no pet.). The applicable sufficiency review comes into play with regard to the first question. *Boyd*, 131 S.W.3d at 611. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* Stated inversely, we must conclude that the trial court's decision was neither arbitrary nor unreasonable. *Id.*; *Lindsey*, 965 S.W.2d at 592.

Further, when the burden of proof at trial is by clear and convincing evidence, as in the case of a claim for economic contribution against the community estate, we apply a higher standard of legal and factual sufficiency review. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex.2002); *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002); *Boyd* 131 S.W.3d at 611. Clear and convincing evidence is defined as that "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex.1994); *Boyd*, 131 S.W.3d at 611. This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980); *Boyd*, 131 S.W.3d at 611. The proof must weigh more heavily than merely the greater

weight of the credible evidence, but the evidence need not be unequivocal or undisputed. *Boyd,* 131 S.W.3d at 611.

In reviewing the evidence for legal sufficiency, we look at all the evidence, in the light most favorable to the judgment, to determine if the trier of fact could reasonably have formed a firm belief or conviction that its finding was true. *In re J.F.C.,* 96 S.W.3d at 265–66. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* at 266. In reviewing the evidence for factual sufficiency, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the allegations in the petition were proven. *In re C.H.,* 89 S.W.3d at 25; *Boyd,* 131 S.W.3d at 611.

C. ISSUES RELATED TO CHRISTY'S ECONOMIC CONTRIBUTION CLAIM

*1. Effect of 1987 Postnuptial Agreement*

The parties stipulated that the 1987 postnuptial agreement was valid. The trial court found by clear and convincing evidence that the postnuptial agreement was valid, unambiguous, and limited the extent of the pre-divorce community estate solely to the DeLoache property. The trial court also found by clear and convincing evidence that the postnuptial agreement did not prohibit Christy's claim for economic contribution by her separate estate.

In issues one and two, Thomas contends the trial court erred in considering Christy's economic contribution claims for the down payment and mortgage payment and for the first phase of renovation expenses because those claims were precluded by the subsequent (1987) postnuptial agreement. First, Thomas argues that Christy waived her claim for economic contribution in paragraph 3.03 of the 1987 postnuptial agreement. That paragraph, entitled "Waiver by Wife," provides:

> Wife waives and releases any right of reimbursement that she might presently or in the future have or claim on behalf of her separate estate or the community estate against the separate estate of Husband.

Paragraph 3.03 plainly waives Christy's claim for reimbursement against Thomas's *separate estate.*[4] Here, however, Christy asserted a claim for economic contribution against the *community estate,* not Thomas's separate estate. The plain language of paragraph 3.03 does not apply to waive and release this claim. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983).

Thomas also argues that, because no specific mention was made of the $310,000 purchase price and the pre–1987 capital improvements in the agreement, the 1987 postnuptial agreement designated the equity that existed in the DeLoache property as community property, even if Christy's separate estate paid those amounts. Thomas argues that the intent of the parties as expressed in the postnuptial agreement was to partition their property and define the DeLoache property as community, which necessarily included any equity that existed in the DeLoache property. *See City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968) (stating, as general contract law principles, that where an unambiguous writing has been entered into between parties, courts

---

4. Paragraph 3.02 contains identical language waiving and releasing Thomas's present or future rights of reimbursement against Christy's separate estate.

will give effect to parties' intention as expressed or as is apparent in the writing; instrument alone will be deemed to express parties' intention, for it is objective, not subjective, intent that controls). Thomas argues that any claim to those funds was "merged into" the postnuptial agreement, "estopping" Christy from making an economic contribution claim for those funds at divorce.

The text of the 1987 postnuptial agreement does not support Thomas's argument. Although incorporated into a final divorce decree, a marital property agreement is treated as a contract, and its legal force and meaning are governed by the law of contracts, not by the law of judgments. *Allen v. Allen,* 717 S.W.2d 311, 313 (Tex.1986). In construing a written contract, the court must determine the true intentions of the parties as expressed in the instrument. *Coker,* 650 S.W.2d at 393. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Id.*

Paragraph 2.01 of the agreement provides that the property listed in Schedule A to the agreement is Christy's "sole and separate estate," and that Thomas "grants, releases, and confirms to [Christy] ... all right, title, and interest in and claims to that property...." Paragraph 2.02 contains identical language in favor of Thomas with respect to his separate property (listed in Schedule B). However, paragraph 2.03 (which provides that the DeLoache property is community property) does not contain the "grants, releases, and confirms" language found in paragraphs 2.01 and 2.02. Thus, neither Thomas nor Christy "grant[ed], release[d], and confirm[ed] ... all right, title, and interest in and claims to" the DeLoache property.

Further, as discussed above, paragraphs 3.02 and 3.03 waived and released Thomas's and Christy's present and future claims for reimbursement against each other's separate estates, but not claims against the community. By referring to—and waiving and releasing—some reimbursement claims but not others, the document makes clear that not only is there no waiver of Christy's claim against the community estate, but also that she is not estopped from asserting that claim.

Thomas's argument also ignores paragraph 6.01 of the agreement, which provides: "All property not listed on any schedule attached to this agreement will be owned by [Christy] as separate property. [Thomas] grants, conveys, and assigns to [Christy] an undivided one hundred percent (100%) interest in any such unlisted property owned in the name of either property." Thomas's argument is that the 1987 postnuptial agreement cut off any claim for contribution by Christy's separate estate because it did not mention the $310,000 purchase price and the pre–1987 capital improvements, both of which had been paid out of Christy's separate property. Thus, to the extent Christy's separate property claim for economic contribution against the community estate was an asset at the time of the postnuptial agreement, that claim continued to be hers.

Accordingly, we conclude the above-language in the 1987 postnuptial agreement and its partition of the DeLoache property as community property does not preclude Christy's claim for economic contribution on divorce.

We resolve issues one and two against Thomas to the extent he argues in these issues that the postnuptial agreement precluded Christy's claim for economic contribution. We address Thomas's arguments under these issues as to the award of attorney's fees and the division of property later in this opinion.

### 2. Characterization

In issues three and four, Thomas contends the trial court erred in its characterization of the parties' estates. Specifically, Thomas argues the trial court erred in not presuming that Christy intended to make a gift to Thomas of any separate property funds she may have expended on the DeLoache property. In support of this argument, Thomas relies on the general rule that when a spouse uses separate property consideration to pay for land acquired during the marriage and takes title to the land in the name of husband and wife, it is presumed the purchasing spouse intended to make a gift of one-half of the separate funds to the other spouse. *Cockerham*, 527 S.W.2d at 168; *In re Marriage of Thurmond*, 888 S.W.2d 269, 273 (Tex.App.- Amarillo 1994, writ denied). The gift is presumed to be to the other spouse rather than to the community estate because it is not possible for a spouse to make a gift to the community estate. *In re Marriage of Thurmond*, 888 S.W.2d at 281 n. 1. The presumption can be rebutted by evidence clearly establishing there was no intention to make a gift. *Cockerham*, 527 S.W.2d at 168.

However, we need not address whether the evidence rebutted any presumption of gift to Thomas's separate estate. Even if Christy is presumed to have intended to give any part of the DeLoache property to Thomas as his separate property in 1979, the 1987 postnuptial agreement partitioned all the parties' property. The DeLoache property, without any res- ervation, was designated as community property; no part of it was partitioned to Thomas as his separate property. Accordingly, this case is distinguishable from the circumstances in *Cockerham* and *In re Marriage of Thurmond*, in which there were no marital agreements subsequent to the properties' purchases that partitioned the properties. Thomas's argument that Christy's economic contribution claim was precluded by any presumption of gift when the DeLoache property was purchased or remodeled fails.

Next, Thomas argues that because Christy gave Thomas lavish gifts during the marriage, including $1 million at the time of the postnuptial agreement, it could be reasonably inferred that Christy intended to make a gift to the community of the improvements made to the DeLoache property as of the date of the postnuptial agreement. This argument fails for the same reasons set forth in the preceding two paragraphs. Further, nothing in the postnuptial agreement or the record connects any cash gifts with improvements to the DeLoache property. We cannot conclude that any testimony regarding other gifts compels the conclusion that Christy included to make a gift of the DeLoache property down payment, mortgage payments, and pre–1987 improvements.

Lastly, Thomas argues that Christy's separate funds were commingled with community funds in the household account before 1987 and Christy did not properly trace her separate funds in this account, and therefore all proceeds in the household account must be presumed to be community property. Because this argument is addressed to proof of Christy's economic contribution claim through tracing, we address this argument below.

Having rejected Thomas's arguments that any evidence as to gifts precludes

Christy's claim for economic contribution, we resolve Thomas's third and fourth issues against him to this extent.

### 3. Economic Contribution and Tracing

■ In issues three through ten, Thomas challenges the trial court's economic contribution award to Christy. Relevant to these issues, Thomas specifically challenges the following findings of fact, which the court found by clear and convincing evidence:

- Christy satisfied her burden of rebutting the community property presumption of family code section 3.003.
- The burden to prove that community funds were utilized in the purchase of, reduction of debt on, and/or capital improvements on the DeLoache property should be and was shifted to Thomas and that Thomas failed to meet that burden.
- Christy's claim for economic contribution has merit and should be granted as rendered in the final decree of divorce.
- Christy's separate estate was the sole and exclusive source of funding for the $10,000 down payment, $300,000 payoff of balance due on the original note and mortgage lien, and $1,249,043.45 in subsequent capital improvements, which total a claim by Christy's separate estate for economic contribution of $1,559,043.45.
- The amount of Christy's economic contribution claim does not include expenditures for ordinary maintenance and repair, taxes, interest, or insurance, or any contributions by either spouse of time, toil, talent, or effort during the marriage.
- It would be fair, just, and equitable under the totality of the circumstances to award a claim for economic contribution against the community estate in favor of Christy's separate estate for $1,559,043.45.
- Christy provided receipts of capital improvements in the amount of $1,249,043.45.
- Christy's economic contribution claim should be satisfied by awarding the community interest in the DeLoache property in its entirety and, in accordance with the 1987 postnuptial agreement, there was no more community property to be awarded.
- The economic contributions to the community property by the community estate during the marriage was zero.

Because issues three, four, and six concern tracing, we detail that evidence.

First, the trial court found "by clear and convincing evidence that it is uncontroverted that [Christy's] Separate Estate also paid the $10,000 down payment and the $300,000 mortgage" on the DeLoache property. Further, Christy testified that the money for the down payment and the payoff of the note came from stock that she owned before marriage, and that Thomas made no contribution to those payments. There was no evidence that money for those payments was commingled in the household account. Thomas does not attack this finding, and it is binding on him on appeal. *See Employers Cas. Co. v. Henager*, 852 S.W.2d 655, 658 (Tex. App.-Dallas 1993, writ denied) (unchallenged findings of fact are binding on parties and appellate court). Accordingly, we conclude that Christy properly traced these amounts to her separate estate.

With respect to the funds used in the first phase of remodeling, Christy testified those funds came from a remodeling account that was "a separate property and estate account." Christy testified that the remodeling account was set up at Forney State Bank as her separate property ac-

count and funded by money from her separate property account at Brown Brothers Harriman in New York. According to Christy, the Brown Brothers account was funded with cash from the buyout of her family's business. Christy testified that all of the bills and invoices for the remodeling were paid out of the "remodeling account" and none of the bills were paid out of the "joint account" or out of any account into which Thomas deposited any of his earnings. Christy testified that the household account was also set up at Forney State Bank and when that bank failed, the accounts were moved to Union Bank and Trust.

Thomas asserts Christy failed to properly trace her separate funds that were commingled with community funds in the household account before October 1987; therefore, argues Thomas, all proceeds in the "household and/or remodeling account" must be presumed community and Christy failed to rebut this presumption by clear and convincing evidence. Specifically, Thomas argues that "apparently, a substantial amount of money, if not all of the money, for this initial improvement was deposited, although controverted by Wife, in the Union Bank household account number [ ] and its successor accounts." To support this statement, Thomas cites the testimony of Cathy Beath, the parties' bookkeeper since 1986.

It is undisputed that this household account was a joint account, into which both Christy's and Thomas's separate property was deposited. Beath testified that in 1987 or 1988 (*after* the initial improvement phase), the parties' "personal" accounts were closed, and all expenses were paid from the household account. According to Beath, a joint account at Comerica Bank was opened in 1991, when Union Bank closed. Beath testified that Christy moved her funds from Brown Brothers to Smith,

Barney and that, even after the parties' separate checking accounts were closed, Christy maintained the Smith, Barney account. Thus, Christy's and Beath's testimony shows that, although the parties had a joint account, first at Forney State Bank, then at Union Bank, and then at Comerica Bank, from which household expenses were paid, no improvements in the initial phase were paid from the joint account. Accordingly, the record does not support Thomas's argument that money for the initial improvements (made between 1979 and 1986) was paid from Christy's separate property accounts into the joint household account, where it was commingled with Thomas's separate property or community property.

As to the funds used to construct the garage in 1991 and 1992, Christy testified that money was paid from a separate property account that was not the same remodeling account that had existed in the 1980s. She testified that, by 1991, there was a separate property account and a joint household account at Union Bank and Trust. Christy testified that the source of funds for the second remodeling account was income from her separate property and Thomas did not contribute any money to this account. Christy testified that she paid all the bills for the garage construction from this second remodeling account. In addition, Christy testified that Thomas made no economic contributions to the De-Loache property, either by money from the community joint account or from his separate account.

Beath collected and reviewed invoices and receipts from the contractor. Christy's counsel asked Beath if she remembered from which account the expenditures for the garage construction were paid, and Beath testified that she did not recall whether they were paid from the household or Christy's separate property

account. Later, Christy's counsel asked, "Who, if anyone, contributed to pay the improvements on [the] garage?" to which she replied, "Mrs. Moroch." Also, Beath testified that the contractors took "draws" of money, which "came straight out of Smith Barney[,] [w]hich kept me from having to go, Smith Barney to household, household to whatever."

Although there was contradictory testimony whether there was a second remodeling account in the second phase of the improvements, there was evidence that the money used to pay for these improvements was from Christy's separate property that was not deposited into any joint account and commingled with other funds. Moreover, although it is undisputed that money from Christy's and Thomas's separate property was commingled in the joint account at Union Bank and its successor account at Comerica Bank, any tracing issue as to this account is irrelevant because there was no evidence that funds from these accounts paid for any improvements. Accordingly, we resolve Thomas's third and fourth issues as to tracing against him.

■ In issue six, Thomas argues that Christy failed to show by clear and convincing evidence that her separate property was the source of payments for the capital improvements. Thomas relies on *Anderson v. Gilliland,* 677 S.W.2d 105, 107 (Tex.App.-Dallas 1984), *rev'd in part on other grounds,* 684 S.W.2d 673 (Tex.1985) (affirming court of appeal's judgment insofar as separate funds not properly traced). However, *Anderson* involved paying a down payment from an account that commingled separate and community funds and the failure of the party seeking reimbursement to show that any community funds in the account were not used to pay the down payment under the community-out-first presumption. Here, there was testimony that there was no commingling of separate and community funds used to pay for the capital improvements. *Anderson* is distinguishable.

Likewise, Thomas's reliance on *McKinley,* 496 S.W.2d at 543–44, is misplaced. In *McKinley,* a party failed to trace separate property used in the purchase of a savings certificate when the only evidence as to the source of funds to purchase the savings certificate was "wholly inconclusive." Here, as noted above, both Christy and Beath testified that payment for capital improvements came directly from separate property accounts without commingling with community funds in the household account.

Further, Thomas argues that Christy and Beath testified that there were no records for checks and deposits for the first phase of renovations and that such documents were necessary to show both the source of funds and the fact of payment. Specifically, Thomas argues that there was no evidence that identified from which bank account the checks tendered for payment for improvements were written and whether the capital improvement expenditures were paid from the household account, which was community property, or from separate property. However, both Christy and Beath testified that Christy's separate property was the source of the funds to pay the improvements. *See Holloway v. Holloway,* 671 S.W.2d 51, 55–56 (Tex.App.-Dallas 1983, writ dism'd w.o.j.) ("We know of no authority holding that a witness is incompetent to testify concerning the source of funds in a bank account without producing bank records of the deposits."). Beath testified that there were no checks or deposits before 1994; there was evidence that these documents were stored in boxes in the DeLoache house, but disappeared before trial. However, nothing in the record indicates that

the checks or deposit slips would show any use of a joint account, which is the only tracing issue Thomas raises as to the first phase of the capital improvements.

Also, Thomas argues that, because Christy failed to properly trace her separate funds which were commingled with community funds in the household account before the 1987 postnuptial agreement, all proceeds in the household account must be presumed to be community property. It is undisputed that the Union Bank household account was designated community property in the postnuptial agreement. However, Christy testified that improvements to the DeLoache property were paid out of remodeling accounts that were not the same account as the Union Bank household account in the postnuptial agreement, nor were the remodeling accounts joint accounts. Therefore, whether any separate funds were commingled with community funds in the Union Bank household account before or after the 1987 postnuptial agreement is irrelevant to this appeal because Christy is not claiming any cash assets in the household account. The relevant tracing issue is whether Christy traced the funds spent on behalf of the DeLoache property. *See* Tex. Fam.Code Ann. § 3.401(2) (Vernon Supp.2004–05) (defining "economic contribution" as "the *contribution* to a marital estate") (emphasis added). Economic contribution is a claim for a "dollar amount" expended on behalf of a marital estate. *Id.* § 3.402(a). Thus, tracing the funds in the household account is irrelevant because the characterization of the funds in that account is irrelevant. We resolve Thomas's sixth issue against him.

### 4. Evidentiary Issues

Before we address Thomas's additional issues regarding contribution, we address Thomas's seventeenth issue, complaining of the admission of evidence re-

garding capital improvements. Thomas contends that the trial court erred in relying on Christy's "summaries," including Exhibit 40, because the summaries were inadmissible and constitute no evidence. Although Thomas lists several exhibits, the only exhibit he specifically argues the trial court erred in admitting is Exhibit 40. Accordingly, Thomas has waived on appeal any argument as to the admissibility of any other exhibit by failure to brief that argument on appeal. *See* Tex.R.App. P. 38.1(h) (providing that brief must contain clear and concise argument for contentions, with appropriate citations to authorities and record).

Exhibit 40 was introduced showing the "costs of improvement" to the DeLoache property between 1979 and 1992. The exhibit shows a description of the item purchased or service provided, the name of the provider, the date of the bill/invoice/statement, the amount billed, and the "check number and paid date." Christy testified Exhibit 40 was a "summary of every bill paid on the renovation of the house on DeLoache"; it was "a single summary compiling the other summaries"; and she had reviewed "every single receipt" in preparing the summary. The total amount of the Exhibit 40 calculations is $1,249,043.45, which is the amount the trial court found for capital improvements.

With regard to the trial court's decision to admit Exhibit 40, we apply an abuse of discretion standard of review. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). With respect to factual matters, a trial court abuses its discretion if, under the record, it reasonably could have reached only one decision and it failed to do so. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). However, because a trial court has no discretion in determining what the law is or applying the law to the facts, a clear fail-

ure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

■ Thomas objected to Exhibit 40 on three grounds. The trial court overruled all objections and admitted Exhibit 40. We review these three objections seriatim.

First, Thomas objected to Exhibit 40 on the grounds that it included items that were not reimbursable. Whether any item is a capital or non-capital expense is a question of burden of proof as to each item on the exhibit, not a question of admissibility of the exhibit itself. As the trial court noted, whether an individual entry was a legitimate capital expense was a matter to be developed on cross-examination. This ground does not support exclusion of Exhibit 40.

Second, Thomas objected to Exhibit 40 on the grounds that it did not comply with the requirements of rule of evidence 1006. Rule of evidence 1006 relates to summaries and provides

> the contents of voluminous writings, …, otherwise admissible, which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

Tex.R. Evid. 1006. Third, Thomas objected that Exhibit 40 was not a summary of documents already in evidence.

Before Exhibit 40 was admitted, several other summaries of expenses were admitted, including Exhibit 5. Exhibit 5 is a table of all improvement and maintenance expenses on the DeLoache property between 1979 and 1985. Exhibit 5 included non-capital expenses, which are not recoverable pursuant to section 3.402(a)(6), (b).

*See* Tex. Fam.Code Ann. § 3.402(a)(6), (b) ("economic contribution" is the dollar amount of "capital improvements to property other than by incurring debt" and does not include expenditures for ordinary maintenance and repair or for taxes, interest, or insurance or the contribution by a spouse of time, toil, talent, or effort during the marriage). When Exhibit 5 was admitted, Christy testified that the bills and invoices relating to all the expenses on that exhibit were present in the courtroom and had been made available to Thomas's counsel. There was testimony that Exhibit 40 was a revision of Exhibit 5 that included only capital improvements.

Exhibit 40 included 1991 to 1992 payments for the garage. Beath testified that she kept receipts for the garage construction. She identified the invoices in court. Contrary to Thomas's argument, rule 1006 does not require that the underlying documents be admitted, only that they be admissible. Thomas did not argue to the trial court that the invoices were not admissible. Accordingly, we conclude the trial court did not abuse its discretion in admitting Exhibit 40. We resolve issue seventeen against Thomas.

### 5. Capital Improvements v. Maintenance & Repair

We now return to Thomas's eighth issue, in which he asserts that Christy failed to show by clear and convincing evidence that the payments were for capital improvements because she did not separate amounts paid for maintenance, repair, and other non-capital improvements. As mentioned above, there was testimony that Exhibit 40 was a revision of Exhibit 5 that included only capital improvements. Thomas does not challenge any individual item on Exhibit 40 as being a non-capital expense. We resolve Thomas's eighth issue against him.

### 6. Partial Payments of Capital Improvements

In issue seven, Thomas argues that Christy failed to show by clear and convincing evidence that all the capital improvements were paid in full. Specifically, Thomas argues that, because some of the entries in the "payment" column in Exhibit 40 were blank, Christy did not prove payment for these items. However, Christy testified that she paid all invoices from separate property investment accounts. In addition, Exhibit 9b is a summary by year of Christy's separate property costs of improvements, totaling $1,249,043.45. Accordingly, there was evidence that all invoices were paid, despite any gaps in Exhibit 40. *See Newland v. Newland,* 529 S.W.2d 105, 107–08 (Tex.Civ.App.-Fort Worth 1975, writ dism'd) (rejecting claim that evidence not clear and convincing where most of tracing testimony, but not all, was corroborated by bank records). We resolve Thomas's seventh issue against him.

### 7. Burden of Proof

In his fifth issue, Thomas contends that the trial court erred in finding that the burden to prove community funds were utilized in the purchase of, reduction of debt on, and capital improvements on the DeLoache property was shifted to Thomas. We conclude that the trial court properly placed the burden on Christy to prove her claim for economic contribution. Any finding of fact that could be interpreted as placing any burden of proof on Thomas to prove that funds other than Christy's separate property were used is an error of law that does not support reversal under these circumstances. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.-Austin 1992, no writ) ("Incorrect conclusions of law will not require reversal, however, if the controlling findings of facts will support a correct legal theory."). We resolve Thomas's fifth issue against him.

### 8. Calculation of the Economic Contribution Award

In issue nine, Thomas contends that the trial court erred in its division of the marital estate because the division takes into account the $10,000 down payment and the $300,000 mortgage payment which were partitioned by the 1987 postnuptial agreement and cannot be counted twice. We have already determined that the postnuptial agreement did not preclude Christy's claim for economic contribution for these amounts. Accordingly, we resolve issue nine against Thomas.

In issue ten, Thomas contends the trial court erred in its calculation of the amount of the economic contribution. As noted above, the parties stipulated that the fair market value of the DeLoache property for purposes of the divorce proceeding was $1,545,000. In the judgment, the trial court awarded Christy the DeLoache property in satisfaction of her economic contribution claim.

Then-effective section 3.403(b) provided the formula for measuring the amount of contribution. First, "equity" must be determined. "Equity," with respect to specific property owned by one or more marital estates, means "the amount computed by subtracting from the fair market value of the property as of a specific date the amount of a lawful lien specific to the property on that same date." Tex. Fam. Code Ann. § 3.401(3) (Vernon Supp.2004–05). Here, the parties stipulated that, for purposes of the divorce proceeding, the fair market value of the DeLoache property was $1,545,000. There was no lien specific to the property as of the divorce proceeding. We reject any argument that the trial court did not properly calculate equity.

Second, we have determined that there is clear and convincing evidence supporting contributions included in the economic contribution claim—$1,559,043.45. Third, there was no equity in the DeLoache property on the date of the first economic contribution by Christy's separate estate. Lastly, there was no evidence that the community estate made any economic contributions to the DeLoache property during the marriage. Applying the mathematical formula yields $1,545,000 as the amount of economic contribution, as found by the trial court.[5] Accordingly, we reject Thomas's argument that the calculation was incorrect. Moreover, Thomas's arguments as to reimbursement and offsetting benefits are irrelevant because the trial court specifically granted Christy's claim for economic contribution. We resolve Thomas's tenth issue against him.

*9. Division of Property*

■ In his sixteenth issue, Thomas contends that the trial court erred in the division of the marital estate. The trial court found by clear and convincing evidence that the only property owned by the community was the DeLoache property. Thus, the only property available to satisfy Christy's claim for economic contribution on behalf of her separate estate was the DeLoache property. Pursuant to section 3.403(d), we conclude that the trial court properly awarded Christy this property in satisfaction of her claim. *See id.* § 3.403(d) ("The amount of a claim under this section may not exceed the equity in the property on the date of dissolution of the marriage. . . ."). Consequently, there was no community property to divide. We resolve Thomas's sixteenth issue against him.

**CHILD SUPPORT**

■ In his fourteenth and fifteenth issues, Thomas challenges the child support payment. Relevant to the child support issues, the trial court found the following by clear and convincing evidence:

- Christy had no net income for tax year 2002, but income should be imputed to Christy based on the value of the award on her separate estate's claim for economic contribution.
- Christy's obligation to provide child support for the minor children should be based on such imputed income and a lump-sum payment would be in the best interest of the children.
- The calculations and the satisfaction of the lump-sum payment as set out in the divorce decree was in the best interest of the children.

The divorce decree ordered Christy to pay Thomas a one-time lump sum child support payment of $76,000 within one day of the closing of the sale of the DeLoache property, if Christy sold the property, or by December 31, 2002, whichever occurred first. The amount was equal to $1,500 per month for two children, times seven months, and $1,200 per month for one

5. As demonstrated by Exhibit 3b, the amount of Christy's claim then-effective section 3.403(b) is calculated as follows:
(1) Equity on dissolution of marriage ($1,545,000) multiplied by
(2)(A) Economic contributions to the property by the contributing estate ($1,559,043) over
  (B)(i) Economic contribution to the property by the contributing estate ($1,559,043) plus
  (B)(ii) Equity in the property on the date of the first economic contribution by contributing estate ($0) plus
  (B)(iii) Economic contributions to the property by the community estate during marriage ($0).
Pursuant to section 3.403(d), the amount of the claim may not exceed the equity in the property on the date of dissolution of marriage, that is $1,545,000.

child, times fifty-five months. The decree also provided that, in the alternative, such amount shall be offset against an equivalent amount payable by Thomas to Christy on a dollar-for-dollar basis pursuant to the terms of the order.

In rendering an order of child support, the trial court must make certain findings if:

(1) a party files a written request with the court not later than ten days after the date of the hearing;

(2) a party makes an oral request in open court during the hearing; or

(3) the amount of child support ordered by the court varies from the amount computed by applying the percentage guidelines.

TEX. FAM.CODE ANN. § 154.130(a)(1)-(3) (Vernon 2002). The findings required are set forth in section 154.130(b). In his fourteenth issue, Thomas argues that the trial court's child support award varies from the amount computed by applying the percentage guidelines pursuant to family code section 154.130(a), but the trial court failed to make the findings required by section 154.130(b).

It is undisputed that Thomas failed to make an oral or written request pursuant to section 154.130(a)(1) and (2). Accordingly, we consider whether the requirement of section 154.130(a)(3) is met.

Section 154.126 provides:

If the obligor's net resources exceed $6,000 per month, the court shall presumptively apply the percentage guidelines to the first $6,000 of the obligor's net resources. Without further reference to the percentage recommended by these guidelines, the court may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the child.

TEX. FAM.CODE ANN. § 154.126 (Vernon 2002).

Here, the trial court found that Christy's income should be imputed as $1,559,043.45, the award for her claim for economic contribution. This amount exceeds $6,000 per month. Section 154.125 provides that the percentage guideline for one child is twenty percent of the obligor's net resources, and the guideline for two children is twenty-five percent of the obligor's net resources. *Id.* § 154.125(b). Applying these percentages to $6,000 pursuant to section 154.126 results in the $1,200 and $1,500 found by the trial court. Thus, the amount of child support ordered by the court does not vary from the amount computed by applying the percentage guidelines. *See Tenery v. Tenery,* 932 S.W.2d 29, 31 (Tex.1996) (per curiam).

Christy acknowledges that the length of time for one child, fifty-five months, was a "clerical error" because that child had only forty-four months of school left before high school graduation. However, sections 154.001 and 154.002 relate to the length of time for which a trial court may order child support. *See* TEX. FAM.CODE ANN. §§ 154.001, .002 (Vernon 2002 & Supp. 2004–05). Therefore, any error in the number of months for which child support is ordered is not a variance of an amount computed by applying the percentage guidelines pursuant to section 154.130(a)(3). Accordingly, we conclude that Thomas is not entitled to the particularized findings required by section 154.130(b) in addition to the findings set out above.

The family code provides guidelines for the support of a child and provides further that "[t]he amount of a periodic child support payment established by the child support guidelines in effect ... at the time of the hearing is presumed to be reasonable, and an order of support conforming to the

guidelines is presumed to be in the best interest of the child." *Id.* § 154.122(a) (Vernon 2002). Accordingly, because the trial court's child support award pursuant to the guidelines is presumed to be reasonable, this amount is in the best interest of the children.

Thomas argues that the findings do not show that the trial court (1) properly calculated Christy's net resources pursuant to section 154.062, or (2) properly deemed Christy's income pursuant to section 154.067.

The family code provides that the court shall calculate net resources for the purpose of determining child support liability. *Id.* § 154.062(a) (Vernon 2002). Resources include income from specific sources, such as wages and salary, and "all other income actually being received." *Id.* § 154.062(b). "When appropriate, in order to determine the net resources available for child support, the court may assign a reasonable amount of deemed income attributable to assets that do not currently produce income." *Id.* § 154.067 (Vernon 2002). A trial court may order a parent to pay child support by a lump sum payment. *Id.* § 154.003 (Vernon 2002).

Christy's accountant testified that Christy's income in 2001 was zero because "income minus deductions would be zero." The accountant testified that deductions such as "margin interest" and property taxes exceeded income from interest and dividends. Christy testified that she had $200,000 in cash, no securities, no trust income, and only a mortgaged separate property residence as assets. She testified that she estimated her loss in 2001 to have been about $500,000. Nevertheless, Thomas argues that, although Christy was an "investor" and had dividend income in 2001, "no inquiry was made into the current state of [Christy's] investments."

However, Thomas's argument relates to gross income, not net income.

Thomas argues that there was no documentary evidence showing the status of Christy's finances. Section 154.063 of the family code provides that the trial court shall require a party to furnish information sufficient to accurately identify that party's net resources and ability to pay child support and produce copies of income tax returns for the past two years, a financial statement, and current pay stubs. *See id.* § 154.063 (Vernon 2002). However, Thomas did not raise any issue in the trial court as to Christy's failure to comply with section 154.063. Accordingly, he has failed to preserve this argument for review. *See* TEX.R.APP. P. 33.1.

In issue fifteen, Thomas contends the set-off of the child support payment against the amounts due Christy as part of the parties' marital property division, that is, Christy's lien on the community property, was improper. The premise of Thomas's argument is that the divorce decree ordered a set-off of the child support payment against the equitable lien imposed on the DeLoache property to secure Christy's economic contribution claim. However, the divorce decree specifically provides that the attorney's fee award is subject to a dollar-for-dollar credit award against the lump-sum child support payment. In light of the child support issues in this case, no abuse of discretion is shown. *Cf. Smith v. Rabago,* 672 S.W.2d 38, 39–40 (Tex.App.-Houston [14th Dist.] 1984, no writ) (concluding set-off of child support arrears against imputed rentals for wrongful possession improper).

We conclude the evidence is legally and factually sufficient to support the trial court's findings as to net income, imputed income, and method of payment. Accordingly, no abuse of discretion is shown. We

resolve Thomas's fourteenth and fifteenth issues against him.

## ATTORNEY'S FEES

In part of his second issue and in issues eleven through thirteen, Thomas challenges the trial court's award of attorney's fees to Christy. An award of attorney's fees must be based upon some statutory or contractual authority. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). A suit for divorce in which the parties are parents of minor children necessarily includes a suit affecting the parent-child relationship (SAPCR). *Capellen v. Capellen,* 888 S.W.2d 539, 545 (Tex.App.-El Paso 1994, writ denied). In any SAPCR proceeding, the court may award costs, which include reasonable attorney's fees. TEX. FAM.CODE ANN. § 106.002 (Vernon Supp.2004–05); *Capellen,* 888 S.W.2d at 545. In cases involving both the division of community property and the parent-child relationship, the court may, within its discretionary powers, award reasonable attorney's fees either as a part of a just and fair division of such property or as costs in the SAPCR proceeding, or may allocate the attorney's fees award between the two categories as the facts may warrant. *Capellen,* 888 S.W.2d at 545.

The final decree of divorce ordered Thomas to pay Christy reasonable and necessary attorney's fees of $99,408.01. The decree also provides for attorney's fees on appeal in two places. First, as part of the "division of the marital estate," the decree grants Christy appellate attorney's fees without any conditioning language. Second, in the "debts to husband" section, the decree states: "In the event of an appeal, the Court grants additional reasonable and necessary attorney's fees and costs of $5,000.00 to the successful party, if the case is appealed to the Court of Ap-

peals, and an additional $7,500.00 if the case is appealed to the Texas Supreme Court[.]" The decree provides that the attorney's fee award is subject to a dollar-for-dollar credit against the lump-sum child support payment of $76,500.

In his thirteenth issue, Thomas argues that the trial court erred in awarding Christy attorney's fees in the event of an appeal without conditioning the appellate attorney's fees upon Christy's successful appeal. An unconditional award of appellate attorney's fees is improper. *Siegler v. Williams,* 658 S.W.2d 236, 241 (Tex.App.-Houston [1st Dist.] 1983, no writ); *King Optical v. Automatic Data Processing,* 542 S.W.2d 213 218 (Tex.Civ. App.-Waco 1976, writ ref'd n.r.e.). To the extent that the award in the "division of marital estate" section is unconditional, Thomas is correct, and the appellate attorney's fees language in that section is improper.

However, the final divorce decree also awards appellate attorney's fees to "the successful party." This language is conditional, and we therefore reject Thomas's argument that the decree awards appellate attorney's fees unconditionally. We resolve Thomas's thirteenth issue against him.

In his eleventh issue, Thomas argues that the trial court erred in awarding Christy attorney's fees because no issue of conservatorship was tried after Christy waived that issue, and the only community asset was awarded to Christy, leaving only Thomas's separate property to satisfy the attorney's fee award. Here, an attorney ad litem was appointed to represent the children's interests, temporary orders on behalf of the children were ordered, and child support was at issue during the trial. Even assuming Christy waived the issue of conservatorship, section 106.002 does not provide that conservatorship must be at

issue at the time of trial in order for the court to award attorney's fees. Because this suit is a SAPCR, the trial court did not err in awarding attorney's fees against Thomas.

Also, Thomas argues that any award of attorney's fees to Christy was error because the amount of the attorney's fees exceeds the value of the community estate, having the effect of divesting Thomas of his separate property. Thomas relies on *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 847 (Tex.App.-Texarkana 1996, writ denied), for the proposition that, when awarding attorney's fees in a divorce action, the trial court has no authority to direct one party to expend separate property funds on the other's behalf for such fees. *Grossnickle* is distinguishable because it was not a SAPCR. Thomas relies on *Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex.App.-Houston [14th Dist.] 1989, writ denied), *overruled on other grounds by Twyman v. Twyman*, 855 S.W.2d 619, 624 (Tex.1993), for the proposition that "[t]he award of attorney's fees in a divorce action not involving the parent-child relationship cannot exceed the value of the community property at issue before the court." Unlike *Chiles*, this case again involved a SAPCR. Thus, Thomas's argument that the attorney's fees award, by exceeding the value of the community estate, improperly divests him of his separate property fails. We resolve Thomas's eleventh issue against him.

In his twelfth issue, Thomas argues that the trial court erred by failing to segregate attorney's fees awarded to Christy between work performed in connection with conservatorship issues, which were waived, and the division of property issues. Thomas did not request that the trial court segregate the attorney's fees. Therefore, he failed to preserve any issue for review. *See* Tex.R.App. P. 33.1. We resolve Thomas's twelfth issue against him.

In part of his second issue, Thomas contends that the postnuptial agreement precludes an award of attorney's fees to Christy. Specifically, Thomas contends that sections 4.01 and 4.03 show an express agreement by Christy not to seek and recover any amounts, including attorney's fees, in excess of the value of the community estate.

Section 4.01 provides that, as part of the partition and exchange reflected by the agreement, "Wife will hold Husband and his property harmless from the liabilities existing or incurred for property listed on [Wife's separate property schedule]." Section 4.03 provides: "Husband and Wife specifically agree not to pledge, contract, bind, promise, impair or place at risk the separate property of the other party." However, because we have previously concluded that attorney's fees may be awarded for a SAPCR, we cannot agree that these sections preclude an award of attorney's fees to Christy.

Also in part of his second issue, Thomas argues that the trial court erred in awarding attorney's fees because there was no evidence at trial of the reasonableness and necessity of attorney's fees. However, the record shows that Christy's counsel submitted exhibits showing his attorney's fees and expenses totaled $99,408.01, and he testified that they were reasonable and necessary. Accordingly, the record does not support Thomas's argument as to lack of proof of reasonable and necessary attorney's fees. Thomas's argument in his second issue regarding attorney's fees is resolved against him.

## CONCLUSION

Having resolved all of Thomas's issues against him, we affirm the trial court's final decree of divorce.

BRIDGES, J. dissenting.

Dissenting Opinion by Justice
BRIDGES.

I respectfully dissent. Because I conclude the 1987 postnuptial agreement precludes Christy Calvert Collins' claim for economic contribution, I would reverse and remand for further proceedings.

The 1987 postnuptial agreement partitioned property as follows:

2.01   Wife's Property

Wife will own, possess, and enjoy as her sole and separate estate, free from any claim of Husband, the property listed in Schedule A; and Husband partitions to Wife all that property, together with any insurance policies covering that property and any escrow accounts that relate to that property; and Husband grants, releases, and confirms to Wife and to her heirs and assigns all right, title, and interest in and claims to that property, to have and to hold the same, with all and singular the hereditaments and appurtenances thereto belonging forever.

2.02   Husband's Property

Husband will own, possess, and enjoy as his sole and separate estate, free from any claim of Wife, the property listed in Schedule B; and Wife partitions to Husband all that property, together with any insurance policies covering that property and any escrow accounts that relate to that property; and Wife grants, releases, and confirms to Husband and to his heirs and assigns all right, title, and interest in and claims to that property, to have and to hold the same, with all and singular the hereditaments and appurtenances thereto belonging forever.

2.03   Community Property

Husband and Wife will own, possess, and enjoy as their community estate, the property listed in Schedule C, together with any insurance policies covering that property and any escrow accounts that relate to that property.

"Schedule C" listed two items: "The house and lot located at 5106 DeLoache, Dallas, Texas" and "[a]ll funds in the Union Bank Household Account."

As the majority sets forth, the paragraphs partitioning each party's separate property contain identical language providing that each party "grants, releases, and confirms to [the other party] all right, title, and interest in and claims to that property. . . ." However, the majority notes, the provision describing community property contains no such "grants, releases, and confirms" language. Based on this difference, the majority states neither Thomas nor Christy "grant[ed], release[d] and confirm[ed] . . . all right, title, and interest in and claims to" the DeLoache property. Though the majority opinion does not specifically say so, the majority appears to conclude that Christy thus did not waive any economic contribution claim related to the DeLoache property. The majority then cites paragraph 6.01 of the agreement which provides that "All property not listed on any schedule attached to this agreement will be owned by Wife as separate property. Husband grants, conveys, and assigns to Wife an undivided one hundred percent (100%) interest in any such unlisted property owned in the name of either party." The majority concludes that, "[t]o the extent Christy's separate property claim for economic contribution against the community estate was an asset at the time of the postnuptial agreement, that claim continued to be hers."

On the contrary, I would conclude that the provision regarding community property contains no "grants, releases, and confirms" language because such a grant is unnecessary. The agreement clearly sets aside the DeLoache property as community property, effectively "granting" an interest in the property to both Thomas and Christy. Under paragraph 2.04 of the agreement, each party's earnings, recover-

ies for loss of earning capacity, and all property acquired in the future are partitioned as each party's separate property. I would conclude paragraph 6.01 applies, as it is entitled, to "Undisclosed property" only. The majority seems to interpret "undisclosed" as applying to Christy's funds used as the down payment and mortgage payment on the DeLoache property and for the first phase of renovation. As I read the agreement, its plain terms set aside the DeLoache property, in its entirety, as Thomas and Christy's community property. The agreement partitions each party's separate property and all earnings and property acquired in the future but does not include, as a separate item, any reference to money paid by Christy toward the DeLoache property. I would conclude the agreement thus precludes Christy's economic contribution claim for funds paid in relation to the DeLoache property.

Accordingly, I would sustain Thomas' first and second issues and remand this cause to the trial court for further proceedings.